1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11  BRITNEY XIOMARA PRIETO              Case No. 1:25-CV-01017-JLT-SAB
    SALAZAR,
12                                       ORDER GRANTING PRELIMINARY
                        Petitioner,      INJUNCTION[1]
13
    v.                                   (Doc. 2)
14
    POLLY KAISER, et. al,
15
                        Respondents.
16

17          Britney Xiomara Prieto Salazar, a Columbian national, is a female asylum seeker who

18  came to the United States in 2024 "seeking refuge from the torment she experienced due to her

19  sexuality." (Doc. 1, ¶ 1.).

20          On or about January 19, 2024, Ms. Salazar was encountered by a Border Patrol Agent in

21  the El Paso, Texas Border Patrol Sector. (Doc. 9-1 at 5–7.) She admitted to being a citizen of

22  Columbia, to illegally crossing the border without inspection, and to not having the proper

23  documents to enter, pass through, or remain in the United States. (*Id*. at 7.) She was transported

24  to the El Paso Hardened Facility where she was released on recognizance according to INA

25  § 236(a)/8 U.S.C. § 1226. (*Id*. at 8; *see also* Doc. 12, Ex 1 (Form I-220A indicating release on

26  _____

27  [1] Upon the agreement of the parties, the Court converts the motion for temporary restraining order into one for
    preliminary injunction. Respondents had notice, opportunity to respond and be heard. Additional briefing is not
    required and the standard for a TRO and a preliminary injunction is the same. As such, given the nature of the relief
28  granted by this order and to allow Respondents to appeal should they choose, the Court converts this to a Motion for
    Preliminary Injunction.

1    own recognizance pursuant to 8 U.S.C. 1226; *id.*, Ex. 2 (Form I-286, indicating the same).) In

2    doing so, immigration officials necessarily determined that Petitioner did not present a risk of

3    flight or danger to the community. *See* 8 C.F.R. § 1236.1(c)(8) ("Any officer authorized to issue

4    a warrant of arrest may, in the officer's discretion, release an alien not described in section

5    236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that

6    the alien must demonstrate to the satisfaction of the officer that such release would not pose a

7    danger to property or persons, and that the alien is likely to appear for any future proceeding.").

8    When she was released, she was provided a Notice to Appear "[i]n removal proceedings under

9    [INA] Section 240," with a hearing date of August 8, 2025. (Doc. 1, ¶ 50; Doc. 9-1 at 10.)

10         In September 2024, Ms. Salazar submitted an asylum application within the one-year

11   post-entry timeline. (*Id.*, ¶ 51.) Thereafter, she obtained her work permit and began working

12   lawfully as a rideshare driver to help support her family. (*Id.*, ¶ 53.) She has been living with her

13   brother and his family in the San Francisco Area, assisting her sister-in-law through a high-risk

14   pregnancy. (*Id.*, ¶ 65.) Her sister-in-law was hospitalized approximately a month ago and now

15   must attend regular medical appointments for her health and the health of her unborn child.

16   (Doc. 2-2 at ¶ 5.) Because of her sister-in-law's medical situation, Ms. Salazar is a significant

17   caregiver for the children in the household while also working to provide financial support. (*Id.*)

18   Ms. Salazar also provides financial support to her own son and her mother who are still in

19   Columbia. (*Id.*, ¶ 7.) Since her release, Ms. Salazar has fully complied with court and filing

20   requirements. (Doc. 1, ¶ 52.) She has no criminal history. (*Id.*; *see also* Doc. 9-1 at 7.)

21         On August 8, 2025, Ms. Salazar attended her first regularly scheduled master calendar

22   hearing in her Section 240 removal case before Immigration Judge (IJ) Joseph Park. (Doc. 1,

23   ¶ 2.) Ms. Salazar requested an individual hearing on her asylum case, which IJ Park granted and

24   set for February 28, 2028. (*Id.*) IJ Park also set a date in December 2025 for Ms. Salazar to file a

25   remedied asylum application. (*Id.*) Following these calendaring actions, an attorney for the

26   Department of Homeland Security (DHS) orally moved to dismiss the removal case against Ms.

27   Salazar, citing a "custody redetermination." (*Id.*) IJ Park did not grant that motion but instead

28   allowed petitioner ten days to respond in writing. (*Id.*)

2

1    As Ms. Salazar was leaving the courtroom, she was detained by ICE agents who were

2    waiting outside the door. (*Id.*) She was transported to the Mesa Verde Detention Center. (*Id.*)

3    Ms. Salazar's sister-in-law was waiting for her outside the courthouse, but Ms. Salazar never

4    emerged. (Doc. 2-2, ¶ 2.)

5    On August 18, 2025, Ms. Salazar had another hearing before an IJ related to her ongoing

6    Section 240 removal proceedings. (Doc. 10.) At that hearing, the IJ continued the matter

7    September 8, 2025, to allow Ms. Salazar more time to gather documents in support of her case

8    and to allow this Court to hear her pending habeas petition. (*Id.*) It is undisputed that DHS's

9    motion to dismiss remains pending, so Ms. Salazar's Section 240 removal proceedings remain

10    pending as well.

11    On August 13, 2025, Ms. Salazar filed a petition for writ of habeas corpus alleging that

12    her detention constitutes a violation of the Fifth Amendment's right to substantive and procedural

13    due process. (Doc. 1, ¶¶ 67–76.) She seeks immediate release from custody; a declaration of the

14    violation of her rights under the Fifth Amendment[2]; an injunction prohibiting her transfer away

15    from this District and from re-detention without a pre-deprivation custody hearing "before a

16    neutral arbiter in which the government bears the burden of proof, by clear and convincing

17    evidence, that Petitioner is a flight risk or danger to the community"; and for costs and attorney's

18    fees. (*Id.* at 17–18.)

19    On the same day, she also filed an ex parte motion for a temporary restraining order. (Doc

20    2.) In that motion, she seeks immediate release "without requiring bond or electronic

21    monitoring[3]" and a prohibition against her re-detention without a pre-deprivation hearing. (*Id.* at

22    18; Doc. 2-5 at 32).)

23    The government opposes the issuance of preliminary injunctive relief and maintains that

24    Petitioner's detention is "mandatory" under expedited removal procedures set forth at 8 U.S.C.

25

26    [2] The jurisdictional allegations (Doc. 1, ¶ 9) also mention the Fourth Amendment and the Administrative Procedure Act, but there is no Fourth Amendment or APA claim alleged.

27

28    [3] Petitioner seeks, as an alternative, "her immediate release and the setting of a pre-deprivation bond hearing before the San Francisco Immigration Court within 14 days." (Doc. 2-3 at 27.) The Court declines to consider this alternative relief.

1    § 1225(b)(1), (*see generally* Doc. 10), notwithstanding the fact that Petitioner's removal

2    proceedings pursuant to 8 U.S.C. § 1229a remain pending. Moreover, the parties agree that Ms.

3    Salazar was not placed in expedited removal upon her arrival (or at any other time). At most, the

4    government suggests that ICE sought the dismissal of the Section 240 proceedings to put her in

5    expedited removal, but there is no evidence this has occurred.

6         For the reasons set forth below, the Court converts the request for a temporary restraining

7    order into a request for a preliminary injunction and **GRANTS** the motion.

8    **II.    LEGAL BACKGROUND**

9         **A.    Section 240 v. Expedited Removal Proceedings**

10        Immigration law provides two main processes for removing noncitizens deemed ineligible

11   to enter or remain in the United States. The first, commonly referred to as "Section 240" or

12   "Section 1229a" proceedings, is the standard mechanism for removing inadmissible noncitizens.

13   *See generally* 8 U.S.C. § 1299a. "Section 240 removal proceedings take place before an

14   [Immigration Judge (IJ)], an employee of the Department of Justice (DOJ) who must be a

15   licensed attorney and has a duty to develop the record in cases before them." *Coalition For*

16   *Humane Immigrant Rights, v. Noem*, No. 25-CV-872 (JMC), 2025 WL 2192986, at *3 (D.D.C.

17   Aug. 1, 2025)[4] (citing 8 U.S.C. § 1229a(a)(1), (b)(1) ("The immigration judge shall administer

18   oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any

19   witnesses.").)

20        [Section 240 proceedings] are adversarial proceedings in which the
          noncitizen has the right to hire counsel, examine and present
21        evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). The
          hearings are recorded, and a transcript is made available if a party
22        appeals the decision. *Id.* § 1229a(b)(4)(C). A section 240 proceeding
          typically takes place over the course of multiple hearings due to the
23        built-in procedures. This allows time for noncitizens to both gather
          evidence in support of petitions for relief available in immigration
24        court (like asylum and certain adjustments of status) and seek
          collateral relief from other components of DHS (like adjustment of
25        status on the basis of marriage or family). Upon a decision by the IJ,
          either party may appeal to the Board of Immigration Appeals (BIA).
26        8 C.F.R. §§ 1240.15, 1003.1. If the BIA upholds a removal order, the

27

---

28   [4] This ruling has been appealed to the D.C. Circuit, *Coalition for Humane Immigrant Rights, et al v. Kristi Noem*, et
     al, 25-5289 (D.C. Cir.), though the stay ordered by *Coalition* remains in place as of the signing of this order.
     Petitioner's arrest here occurred despite the stay ordered in *Coalition.*

noncitizen may then appeal that decision to a U.S. court of appeals.
8 U.S.C. § 1252.

*Coalition*, 2025 WL 2192986, at *3 (internal record citations omitted).

Alternatively, an immigrant may be placed in "expedited removal" status for various reasons, including that the person entered the United States without a valid visa or other valid entry documents. *See generally* 8 U.S.C. § 1225. In expedited removal, the process is overseen by an immigration officer, rather than an IJ. 8 C.F.R. § 235.3(b)(2)(i). The officer asks the immigrant questions about their "identity, alienage, and inadmissibility," and whether they intend to apply for asylum, fear persecution or torture, or fear returning to their country of origin. § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning, and no recording or transcript is made. 8 C.F.R. § 235.3(b)(2)(i).

Under the expedited removal process, if the immigrant claims asylum, fear of persecution or torture, or a fear of returning to his or her country, "the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 CFR 208.30." § 253.3(b)(4). Once the referral happens, the referring officer must provide the immigrant with a written disclosure (Form M-444), which describes the credible fear interview, including,

> (A) The purpose of the referral and description of the credible fear interview process;
> (B) The right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government;
> (C) The right to request a review by an immigration judge of the asylum officer'' credible fear determination; and
> (D) The consequences of failure to establish a credible fear of persecution or torture.

§ 253.3(b)(4)(i). The asylum officer then must interview the immigrant and determine if the immigrant expressed a credible fear of persecution or torture. Whatever the officer's determination, it must be reviewed by the supervisory asylum officer before it becomes effective. 8 C.F.R. § 208.30(3)(8). If there is a finding of credible fear, the case is converted to a § 240 proceeding[5] and set before an IJ. If the asylum officer and the supervisor determine that the

---

[5] Alternatively, the case may be moved into administrative asylum proceedings under § 208.30(f).

1   immigrant has not demonstrated a credible fear of persecution or torture, the immigrant may

2   request review by an IJ. § 208.30(g). Essentially, the IJ's determination is final. *Id*. Likewise,

3   habeas corpus review of the determinations made related to the expedited removal is limited. 8

4   U.S.C. § 1252(e)(2).

5        In *Coalition*, the District of Columbia District Court determined that under 8 U.S.C.

6   § 1225(b)(1)(A)(iii)(II), a person who has been paroled without first having been placed in

7   expedited removal <u>cannot be designated for expedited removal</u>. As *Coalition* explained:

8   > Noncitizens may be eligible for expedited, rather than section 240,
9   > removal only if they are inadmissible on the basis that they either
   > lack proper entry documents or falsified or misrepresented their
10  > application for admission. 8 U.S.C. § 1225(b)(1)(A)(i); *see id*.
   > § 1182(a)(6)(C), (a)(7) (grounds of inadmissibility). Among that set,
11  > only two categories of noncitizens are eligible for expedited removal:
   > (1) noncitizens "arriving in the United States," and (2) noncitizens
12  > who "ha[ve] not been admitted or paroled into the United States" and
   > cannot affirmatively show that they have been "physically present in
13  > the United States continuously for the 2-year period immediately
   > prior to the date of the determination of inadmissibility." 8 U.S.C.
14  > § 1225(b)(1)(A)(i)–(iii). The statute permits the Attorney General
   > (who has since delegated this authority to the DHS Secretary) to
15  > designate the population of noncitizens within that second category
   > who will be subject to expedited removal. And that designation lies
16  > within the Secretary's "sole and unreviewable discretion." *Id*.
   > § 1225(b)(1)(A)(iii); *see* 8 C.F.R. § 235.3(b)(ii) . . .

17  2025 WL 2192986, *5 (footnote omitted). *Coalition* concluded that the statute "forbids the

18  expedited removal of noncitizens who have been, at any point in time, paroled into the United

19  States." 2025 WL 2192986, at *22.[6]

20       Even still, though the government asserts that under 8 C.F.R. § 235.3(b)(1)(ii), "Expedited

21  Removal provisions can be applied at any time" (Doc. 9 at 7), this is contrary to the express

22  language of the section[7] as discussed above. First, Petitioner is not an arriving alien. An

---

[6] Coalition also stayed several administrative actions undertaken by DHS, including one memorandum issued in January 2023 that directed relevant officials to "consider" placing in expedited removal "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied," a process that "may include steps to terminate any ongoing removal proceeding and/or active parole status," as well as a separate February 2025 directive that ICE "consider" for expedited removal "paroled arriving aliens." *Coalition*, 2025 WL 2192986, *9–10, 39. The government does not address *Coalition* or its consequences in its briefing here.

[7] This section reads,
> (1) The expedited removal provisions shall apply to the following classes of aliens who are
> determined to be inadmissible under section 212(a)(6)(C) or (7) of the Act:

6

"[a]rriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry . . .  An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked."[8] 8 C.F.R. § 1.2. In this case, Petitioner was **not** released on parole under § 212(d)(5) (codified at 8 U.S.C. § 1182(d)(5)(A)); rather, she was released under § 236(a)(2) (codified at 8 U.S.C. § 1226(a)(2)(B)).

Second, 8 C.F.R. § 235.3(b)(1) specifically exempts from placement in expedited parole those who either have been admitted to the country or those, like Ms. Salazar, who have been paroled. *Coalition* at *22-*27 conducts an exhaustive analysis of 1225(b)(1)(A)(iii)/§ 235.3(b)(1), relevant directives, and case authority to come to its holding. *Coalition* holds that § 1225(b)(1)(A)(iii) "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." 2025 WL 2192986, at *22. The Court agrees with *Coalition's* analysis and adopts it here.

**B.    Parole**

ICE may choose to release a person on parole. The decision is discretionary and is made on a case-by-case basis. An immigrant who has been detained at the border, may be paroled for humanitarian reasons or due to it providing a significant public benefit (8 U.S.C. § 1182(d)(5)(A)) or she may be conditionally released (8 U.S.C. § 1226(a)). These are distinct procedures. A person on conditional parole is usually released on their own recognizance subject to certain conditions such as reporting requirements.[9] To be released on conditional parole, there must be a

---

(i) Arriving aliens, as defined in 8 CFR 1.2;

(ii) As specifically designated by the Commissioner, aliens who arrive in, attempt to enter, or have entered the United States **without having been admitted or paroled** following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2–year period immediately prior to the date of determination of inadmissibility. The Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, at any time, to any class of aliens described in this section.

8 C.F.R. § 235.3(b)(1) (Emphasis added).

[8] Even still, *Coalition* at *27-*30, determined that parolees, no matter whether they were released under § 1182(d)(5)(A) or § 1226(a)(2)(B) are not "arriving aliens."

[9] An immigrant cannot be released on conditional parole if they are subject to mandatory detention under § 1226(c).

finding that the immigrant does not pose a risk of flight or danger to the community. *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115 (9th Cir. 2007). One important difference between these types of parole is that conditional release does not provide a pathway for the immigrant to seek adjustment of status under 8 U.S.C. § 1255(a). *Id*. at 1119-20.

### C.    Parole Revocation

In *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *10–12 (D. Or. July 9, 2025)—issued several weeks before Ms. Salazar's arrest on August 8, 2025—the court explained the parole process in immigration cases and noted that before parole may be revoked, the parolee must be given written notice of the impending revocation, which must include a cogent description of the reasons supporting the revocation decision. The court held:

> Section 1182 . . . has a subsection titled "Temporary admission of nonimmigrants," which allows noncitizens, even those in required detention, to be "paroled" into the United States. This provision, at issue in this case, states:
>
>> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and **when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.**
>
> 8 U.S.C. § 1182(d)(5)(A).

*Y-Z-H-L v Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under the Administrative Procedure Act, immigration parolees are entitled to determinations related to their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the agency fails to "articulate[] a satisfactory explanation for its action including a rational

---

There is no suggestion that § 1226(c) applies in this case.

connection between the facts found and the choice made." *Id*. Parole revocations in the context of the INA must occur on a case-by-case basis and may occur "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id*. at *12 (quoting § 212.5(e)). Section 212.5(e) requires written notice of the termination of parole except where the immigrant has departed or when the specified period of parole has expired.

In considering *Y-Z-H-L* and § 212.5(e), other courts have found that the statute requires a case-by-case analysis as to the decision to revoke parole. In *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV, 2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025), the Court held similarly, though in the context of humanitarian parole:

> This Court agrees that both common sense and the words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole "must attend to the reasons an individual [noncitizen] received parole." *See id*. There is no indication in the record that the government conducted any such analysis here. On the contrary, the letter Mata Velasquez received merely stated summarily that DHS had "revoked [his] parole." Docket Item 62-1 at 5. Thus, there is no indication that—as required by the statute and regulations—an official with authority made a determination specific to Mata Velasquez that either "the purpose for which [his] parole was authorized" has been "accomplish[ed]" or that "neither humanitarian reasons nor public benefit warrants [his] continued presence...in the United States." See 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's parole violated his rights under the statute and regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.

In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the Court reached a similar conclusion relying on the Due Process Clause. In *Pinchi,* the court held,

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on

1

2

preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

3    *Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No.

4    2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v.*

5    *U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme

6    Court has consistently held that non-punitive detention violates the Constitution unless it is

7    strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral

8    decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").[10]

9        Finally, *Coalition* at *37 stayed on a nationwide basis DHS's January 23, 2025

10    memorandum, which authorized ICE officials to terminate or modify any parole program and to

11    consider placing any immigrant amenable to expedited removal into that status. It also issued a

12    nationwide stay of the February 18, 2025 ICE Directive, which directed ICE officials to consider

13    placing parolees into expedited removal. *Id*. Notably, Ms. Salazar was arrested *after* the stay

14    issued and apparently pursuant to these policies. Even still, the government does not address the

15    nationwide stay or *Coalition*.

16    **II.    ANALYSIS**

17        **A.    Jurisdiction**

18            **1.    Habeas Corpus**

19        Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of

20    habeas corpus in which the petitioner asserts she is being held in custody "in violation of the

---

21

22

23

24

25

26

[10] Respondent relies on cases about the due process rights of aliens in different contexts. (*See, e.g.*, Doc. 9 at 6 ("In 2020, the Supreme Court reaffirmed '[its] century-old rule regarding the due process rights of an alien seeking initial entry' explaining that an individual who illegally crosses the border is an applicant for admission and 'has only those rights regarding admission that Congress has provided by statute.' *DHS v. Thuraissigiam*, 591 U.S. 103, 139-40 (2020).")). As one thorough decision recently issued in the District of Arizona explained, *Thuraissigiam* is distinguishable:

In *Thuraissigiam* the Supreme Court held that a petitioner who was stopped at the border did not have any due process rights regarding admission into the United States. *Thuraissigiam*, 591 U.S. at 107. In contrast, the pending § 2241 petition does not challenge any determination regarding [petitioner's] admissibility into the United States, but instead involves a challenge to her detention pending the conclusion of her removal proceedings

27

28

*Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099, at *15 (D. Ariz. Aug. 11, 2025), *report and recommendation adopted sub nom. Rocha Rosado v. Figueroa*, No. CV-25-02157-PHX-DLR (CDB), 2025 WL 2349133 (D. Ariz. Aug. 13, 2025).

1    Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack

2    by a person in custody upon the legality of that custody, and that the traditional function of the

3    writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

4    Mr. Salazar seeks her immediate release from custody, which she contends violates the

5    Constitution of the United States. (*See* Doc. 1 at 16.) Thus, she properly invokes the Court's

6    habeas jurisdiction.

7                    **2.    Judicial Review under the INA**

8    The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g), precludes

9    this Court from exercising jurisdiction over the executive's decision to "commence proceedings,

10   adjudicate cases, or execute removal orders against any alien," there is no removal order at issue

11   here. Thus, Court has the authority to review the termination of Ms. Salazar's parole. *See*

12   *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes judicial

13   review only as to the three areas specifically outlined in the subsection); *see also Reno v.*

14   *American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 482 (1999).

15           **B.    Preliminary Injunction**

16   The standard for issuing a TRO is the same as the standard for issuing a preliminary

17   injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir.

18   2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is

19   "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are

20   "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm" in

21   the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4)

22   "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

23   (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter*

24   test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

25   1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v.*

26   *Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The

27   Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*,

28   at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support

                                          11

1    the issuance of a preliminary injunction where there are "serious questions on the merits … so

2    long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

3    injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy

4    never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).

5    Preliminary injunctions are intended to "merely to preserve the relative positions of the parties

6    until a trial on the merits can be held, and to balance the equities at the litigation moves forward."

7    *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

8        The status quo refers to "the last uncontested status which preceded the pending

9    controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting

10    *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the

11    Court's view, that is the status before Ms. Salazar was arrested and was still on parole. *See*

12    *Kuzmenko v. Phillips,* No. 25-CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025)

13    (granting a temporary restraining order requiring immediate release of the petitioner back to home

14    confinement from custody, as a restoration of the status quo).

15        Even if the Court's action here constitutes a mandatory injunction,[11] the evidence supports

16    that action. Ms. Salazar alleges she has suffered and is suffering violations of her substantive and

17    procedural due process rights and that her continued unlawful detention will impose on her

18    serious injury if the injunction does not issue. The injunction issued here is on firm legal footing;

19    due process clearly requires that Petitioner be given a hearing before her bond is revoked. These

20    injuries are not capable of redress through monetary compensation. Accordingly, injunctive relief

21    is appropriate even under the higher standard for mandatory injunctions.[12]

22    _____

23    [11] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until

24    the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting

25    *Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages,"

26    and the merits of the case are not "doubtful." *Id*. (internal citations and quotation marks omitted).

27    [12] The government questions whether the Court can order preliminary relief of the nature requested here because the relief sought is akin to the relief requested in the underlying § 2241 petition. (Doc. 9 at 4.) The government cites

28    *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992), which indeed held that entering "judgment on the merits in the guise of preliminary relief is a highly inappropriate result." But the circumstances of that case were

1       1.     Likelihood of Success on the Merits

2          This first factor "is the most important" under *Winter*, and "is especially important when a

3 plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

4 Cir. 2023). When an immigrant is placed into parole status after having been detained, a protected

5 liberty interest may arise. *Young v. Harper*, 520 U.S. 143, 147-149 (1997)[13]. The Due Process

6 Clause may protect this liberty interest even where a statute allows the immigrant's arrest and

7 detention and does not provide for procedural protections. *Id.* (Due Process requires pre-

8 deprivation hearing before revocation of preparole); *Morrissey v. Brewer*, 408 U.S. 471, 482

9 (1972).

10          *Morrissey* observed that parole allows the parolee to enjoy the same activities as those

11 who have not been arrested and held in custody including, living at home, having a job, and

12 "be[ing] with family and friends and to form the other enduring attachments of normal life."

13 *Morrissey*, 408 U.S. at 482. "Though the [government] properly subjects [the parolee] to many

14 restrictions not applicable to other citizens," such as monitoring and seeking authorization to

15 work and travel, "his condition is very different from that of confinement in a prison." *Id.* "The

16 parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live

17 up to the parole conditions." *Id.* The revocation of parole undoubtedly "inflicts a grievous loss on

18

19     quite different. In *Mosbacher*, the trial court ordered as preliminary relief the release of data that the defendant sought

20 to keep private and thus, had the Ninth Circuit not reversed, the defendant would "have lost the whole case for all
practical purposes." *Id*. Some district courts have relied on this line of cases to deny immigration detainee's requests

21 for release at the TRO stage. *See, e.g., Mendez v. U.S. Immigr. & Customs Enf't*, No. 23-CV-00829-TLT, 2023 WL
2604585, at *3 (N.D. Cal. Mar. 15, 2023) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Keo v.
Warden of Mesa Verde Ice Processing Center*, No. 1:24-cv-00919-HBK, 2024 WL 3970514 (E.D. Cal. Aug. 28,

22 2024) (citing *Mendez*, *Mosbacher*, and *Comenisch*). But a closer look at *Camenisch* reveals that the Supreme Court
did not intend to bar TROs of the kind requested here. Rather, *Camenisch* stands for the proposition that "findings of

23 fact and conclusions of law made by a court in a preliminary injunction or TRO posture are preliminary and do not
bind the court at the trial on the merits. Thus, it is not appropriate to enter a final judgment at a TRO stage." *Doe v.

24 Noem*, 778 F. Supp. 3d 1151, 1167 (W.D. Wash. 2025) (evaluating government argument based on *Comenisch*). *Doe
v. Bostock*, No. C24-0326JLR-SKV, 2024 WL 2861675 (W.D. Wash. June 6, 2024), cited by the government (Doc. 9

25 at 4), is not persuasive. There, the petitioner was released from a federal correctional facility after serving a criminal
sentence directly into ICE custody and then challenged her <u>continued</u> detention. *Doe v. Bostock*, No. C24-0326-JLR-

26 SKV, 2024 WL 3291033, at *2 (W.D. Wash. Mar. 29, 2024) (report and recommendation). Under those
circumstances, the status quo was <u>detention</u> not release, so the requested form of preliminary relief –immediate
release—was inappropriate for that reason.

27

28     [13] In *J.G.G.*, the Supreme Court re-affirmed that aliens are entitled to due process of law in deportation proceedings
and must be given notice and an opportunity to be heard commensurate with the nature of the case. *Trump v. J. G. G.*,
604 U.S. ___, 145 S. Ct. 1003, 1006 (2025).

the parolee." *Id.* (quotations omitted). Therefore, a parolee possesses a protected liberty interest in her "continued liberty." *Id.* at 481–84. As noted above, *Pinchi,* 2025 WL 2084921, at *3, agreed. The government appears to attempt to skirt this line of cases by arguing that DHS may "at any time" move Ms. Salazar from Section 240 proceedings to expedited removal. (Doc. 9 at 7.) The government argues:

> Petitioner's TRO fails because ICE has discretion to change her removal procedure. Expedited removal can be applied at any time for an alien who fits within specified criteria. 8 C.F.R. § 235.3(b)(1). Here, Petitioner falls within the designation that applies to aliens who have "not been admitted or paroled into the United States" and have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *Id.* Specifically, Petitioner unlawfully entered the United States in January of 2024, and was determined inadmissible on January 20, 2024. Villigran Dec. ¶ 8. Petitioner has not shown that she has been physically present in the United States continuously for the 2-year prior immediately prior to January 20, 2024. Petitioner admittedly did not have the necessary documents to enter, pass through or remain in the United States. Villigran Dec. ¶ 5. Petitioner also falls under the 2004 designation, which applies to aliens who (i) "are physically present in the U.S. without having been admitted or paroled," (ii) "are encountered by an immigration officer within 100 air miles of any U.S. international land border," and (iii) cannot establish "that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter." 2004 Designation, 69 Fed. Reg. at 48,880. Because she was a qualifying noncitizen, Petitioner was subject to expedited removal proceedings.

(Doc. 9 at 4–5.) *Coalition* raises serious doubts as to the applicability of such arguments to Ms. Salazar's factual situation, given that it "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." 2025 WL 2192986, at *22. In other words, even though Ms. Salazar might have been amenable to placement in expedited removal before she was paroled into the United States, DHS chose not to do so under any of the above authorities at that time. Rather, ICE placed her into Section 240 proceedings, which <u>are ongoing</u>[14], and conditionally paroled her for more than a year and a half. The Court acknowledges that the statute indicates that, "The Attorney General at any time may revoke a bond or parole

---

[14] Respondent argues: "Petitioner is currently detained pursuant to 8 U.S.C. § 1225(b)(2)(A) **while her removal proceedings are pending**, and would be subject to 8 U.S.C. § 1225(b)(1) **should the immigration judge grant the motion to dismiss her removal proceedings** and the Department of Homeland security subsequently issues her an expedited removal order." (Doc. 9 at 4–5.)

1    authorized under subsection (a), rearrest the alien under the original warrant, and detain the

2    alien." 8 U.S.C. § 1226(b).[15] As noted above, this does not mean that DHS may exercise its

3    discretion in a manner that is inconsistent with constitutional requirements.

4         Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424

5    U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been

6    applied to Ms. Salazar are sufficient to protect the liberty interest at issue. *Pinchi*, 2025 WL

7    2084921at *3. In *Mathews*, the Court determined,

8         [O]ur prior decisions indicate that identification of the specific
         dictates of due process generally requires consideration of three
9         distinct factors: First, the private interest that will be affected by the
         official action; second, the risk of an erroneous deprivation of such
10        interest through the procedures used, and the probable value, if any,
         of additional or substitute procedural safeguards; and finally, the
11        Government's interest, including the function involved and the fiscal
         and administrative burdens that the additional or substitute
12        procedural requirement would entail.

13   During her more than a year and a half on parole, Ms. Salazar applied for asylum, obtained a

14   work permit and employment, and provided critical support to her extended family in the United

15   States and Columbia. Thus, parole allowed her to build a life outside detention, albeit under the

16   terms of that parole. Ms. Salazar has a substantial private interest in being out of custody, which

17   _____

18   [15] Even assuming, arguendo, that Ms. Salazar's original "parole" was processed for "humanitarian reasons" or
     "significant public benefit" under the exceptions to mandatory expedited removal detention, *see* 8 U.S.C.
19   § 1182(d)(5)(A), *Coalition* suggests that a court reviewing revocation of that kind of arrest should not ignore that the
     parole occurred:

20        [S]ection 1182(d)(5)(A) does not, as Defendants insist, say that parolees return, upon the termination
         or expiration of their parole, to "the position of an applicant for admission standing at the threshold
21        of entry." [ ]. Rather, the provision says that two things happen to such a parolee: (1) he "shall
         forthwith return or be returned to the custody from which he was paroled"; and (2) "thereafter his
22        case shall continue to be dealt with in the same manner as that of any other applicant for admission
         to the United States." In other words, the noncitizen is physically brought back into immigration
23        detention ("custody") and then legally continues to be treated as an "applicant for admission,"
         because his parole itself did not constitute an admission. *See* 8 U.S.C. § 1182(d)(5)(A) (stating that
24        parole "shall not be regarded as an admission of the alien"). **That does not prove that the law
         treats the parole as if it never happened.** At minimum, it recognizes that the parole physically
25        happened, because it contemplates that the noncitizen must be returned to detention. Moreover, it
         does not imply a return to the status of an applicant for admission, because a noncitizen is already
26        an "applicant[ ] for admission" while their parole is active. *See, e.g., Biden v. Texas,* 597 U.S. 785,
         806 [(2022)] ("[T]he INA expressly authorizes DHS to process applicants for admission under a
27        third option: parole.") (citing 8 U.S.C. § 1182(d)(5)(A)). Accordingly, the statute says that the
         noncitizen whose parole is terminated "continue[s]" to be treated as an applicant for admission, not
         that she "returns" to the status of applicant for admission.

28   2025 WL 2192986, at *24 (emphasis added) (internal record citations omitted).

1  would allow her to continue in these life activities, including supporting her family. As other

2  courts have done, the Court concludes that the government's interest in detaining Ms. Salazar or

3  re-detaining her without a hearing, is slight. There is no dispute she has abided by all conditions

4  of her parole, works, and has no criminal record. Other than the still pending motion to dismiss

5  her Section 240 proceedings, there has been no change in Ms. Salazar's circumstances that would

6  warrant a finding that she is either a flight risk or a danger to the community. Thus, the Court

7  concludes that she has demonstrated a likelihood of success on the merits on her procedural due

8  process claim.

9        2.   <u>Irreparable Harm</u>

10       "It is well established that the deprivation of constitutional rights 'unquestionably

11  constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting

12  *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized

13  'irreparable harms imposed on anyone subject to immigration detention' including 'the economic

14  burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*,

15  872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011)

16  (the inability to pursue a petition for review may constitute irreparable harm). The evidence here

17  demonstrates that Ms. Salazar's family is suffering because of her absence.

18        3.   <u>Balance of the Harms/Public Interest</u>

19       Because the interest of the government is the interest of the public, the final two factors

20  merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). The

21  Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-

Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

*Pinchi*, at *3. In addition, there appears to be no dispute that there is no evidence that Ms. Salazar poses a risk of flight or a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the balance of the equities and public interest weigh in favor of Ms. Salazar.

### 4. Bond

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

### C. Parole Revocation hearing

Ms. Salazar requests an order enjoining her re-detention without a pre-deprivation hearing

where the government bears the burden of proof.[16] (*See* Doc. 2 at 20.) In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), the Ninth Circuit considered whether a noncitizen detained under § 1226(a) pending removal proceedings had a right to a second bond hearing where the government would have the burden to establish by clear and convincing evidence that his continued detention was justified. *Rodriguez Diaz* concluded that due process did not require that procedure, reasoning in part that:

> Nothing in this record suggests that placing the burden of proof on the government was constitutionally necessary to minimize the risk of error, much less that such burden shifting would be constitutionally necessary in all, most, or many cases. There is no reason to believe that, as a general proposition, the government will invariably have more evidence than the alien on most issues bearing on alleged lack of future dangerousness or flight risk.

*Id.* at 1212.

However, as the *Pinchi* court explained, *Rodriguez Diaz* did not address the question presented here:

> The Ninth Circuit did not hold in *Rodriguez Diaz* that noncitizens facing removal under section 1226(a) have no due process right to a pre-detention hearing. It held only that a noncitizen detained under section 1226(a) does not have a right to a second bond hearing when the only changed material condition since their first bond hearing is the duration of their detention. Because the question presented here was not presented in Rodriguez Diaz, the court had no opportunity to address it.

*Pinchi*, 2025 WL 2084921, at *4. *Pinchi* went on to discuss why the calculus changes for an individual who had been paroled from immigration custody after their initial detention:

> Even assuming arguendo that the post-detention bond hearing provided under section 1226(a) provides constitutionally sufficient process for those noncitizens who have never previously been detained and released by DHS, [Petitioner's] circumstance is different. Her release from ICE custody after her initial apprehension reflected a determination by the government that she was neither a flight risk nor a danger to the community, and [she] has a strong interest in remaining at liberty unless she no longer meets those criteria. The regulations authorizing ICE to release a noncitizen from custody require that the noncitizen "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons" and that the noncitizen is "likely to

---

[16] Alternatively, she requests that her re-detention be enjoined unless DHS obtains a further order from this Court. (Doc. 2 at 20.) The Court declines to order that alternative form of relief.

appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). "Release [therefore] reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). [Petitioner] was apprehended by ICE officers when she crossed the border into the United States [  ]. ICE then released her on her own recognizance. As ICE was not authorized to release [her] if she was a danger to the community or a flight risk, the Court must infer from [her] release that ICE determined she was neither. [her] release from ICE custody constituted an "implied promise" that her liberty would not be revoked unless she "failed to live up to the conditions of her release." *Morrissey*, 408 U.S. at 482. The regulatory framework makes clear that those conditions were that she remain neither a danger to the community nor a flight risk. [She] justifiably relied on the government's implied promise in obtaining employment, taking on financial responsibility for her family members, and developing community relationships. The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention. Accordingly, [her] private interest in retaining her liberty is significant.

*Pinchi*, 2025 WL 2084921, at *4

This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was required under *Mathews*. The court in *Pinchi* also placed the burden at any such hearing on the government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-detention is necessary to prevent danger to the community or flight. *Id.* at *7. Doing so is logical under the circumstances for the reasons articulated in *Pinchi* – namely that the immigrant's initial release reflected a determination by the government that the noncitizen is not a danger to the community or a flight risk. Since it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention.[17]

## CONCLUSION AND ORDER

For the foregoing reasons, the Court **ORDERS:**

1.     Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a Motion for Preliminary Injunction, and it is **GRANTED**.

---

[17] The Court declines to grant the alternative relief of requiring a further order of this Court before the Petitioner may be re-detained.

2.      Ms. Salazar **SHALL** be released immediately from Respondents' custody. DHS **SHALL NOT** impose any additional restrictions on her, such as electronic monitoring, unless that is determined to be necessary at a future pre-deprivation/custody hearing.

3.      Respondents are **PERMANENTLY ENJOINED AND RESTRAINED** from re-arresting or re-detaining Ms. Salazar absent compliance with constitutional protections, which include at a minimum, pre-deprivation notice describing the change of circumstances necessitating her arrest and detention, and a timely hearing. At any such hearing, the Government **SHALL** bear the burden of establishing, by clear and convincing evidence, that Ms. Salazar poses a danger to the community or a risk of flight, and Ms. Salazar **SHALL** be allowed to have counsel present.

4.      The petitioner may file a brief on the merits within 60 days. The government may file an additional brief related to the merits of the petition within 60 days thereafter and the petitioner may file a reply brief within 15 days of the government's brief.

IT IS SO ORDERED.

Dated:   __**August 25, 2025**__

_Jennifer L. Thurston_
UNITED STATES DISTRICT JUDGE

20